## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DENZIL LAWRENCE,

Plaintiff,

v.

GREGORY SCOTT, et al.,

Defendants.

Case No. 3:19-cv-317-NJR

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT

DENZIL LAWRENCE ("Lawrence"), by his appointed counsel and pursuant to the Court's May 29 and June 7, 2019 orders (Docs. #7 & 10), files this First Amended Complaint against the named Defendants.[1]

### INTRODUCTION

Lawrence brings this action for money damages, declaratory, and injunctive relief pursuant to the Civil Rights Act, 42 U.S.C. § 1983, to address deprivations of his Constitutional rights by institutionally-based brutality at the Chester Mental Health Center (the "Chester Facility").

### PARTIES

---

[1] In compliance with Local Rule 15.1, attached as Exhibit A is a blackline showing all changes from the original Complaint that Lawrence filed by mail, which has been converted to Word format for purposes of comparison.

1.      Now a resident of the state of Florida, Lawrence was an Illinois resident at the time he filed this cause of action, as well as during all times relevant to the allegations in this First Amended Complaint.

2.      Defendant **Illinois Department of Human Services** ("IDHS") is an agency within the state of Illinois and a legal entity with the capacity to sue and be sued. It operates the Chester Facility and employs the individual defendants who have engaged in the unlawful acts here pursuant to policies, practices and customs of the IDHS.

3.      Defendant **Joseph Harper** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as Hospital Administrator of the Chester Facility when Lawrence first arrived there. As the Hospital Administrator, Defendant Harper oversaw all clinical and administrative services at the Chester Facility, exercised and delegated final decision-making authority to the other named Defendants, and trained and supervised them in the performance of their duties.  He was acting under color of law and within the scope of his employment with the IDHS.

4.      Defendant **Gregg Scott** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as Hospital Administrator of the Chester Facility after replacing Defendant Harper on June 1, 2018.  As the Hospital Administrator, Defendant Harper oversaw all clinical and administrative services at the Chester Facility, exercised and delegated final decision-making authority to the other named Defendants, and trained and supervised them in the performance of their duties. He was acting under color of law and within the scope of his employment with the IDHS.

5.    Defendant **Barry Smoot** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as the Director of Security at the Chester Facility at all times relevant to the allegations in this Complaint. As the Director of Security, exercised and delegated final decision-making authority to the entire security staff at the Chester Facility, and trained and supervised them in the performance of their duties.  He was acting under color of law and within the scope of his employment with the IDHS.

6.    Defendant **Shirley Forcum** is a citizen of the state of Illinois and sued in his individual capacity, as well as in her official capacity as a Social Worker on Lawrence's Treatment Team and a Unit Director for Able Unit at the Chester Facility at all times relevant to the allegations in this Complaint. As a Social Worker on Lawrence's Team, she maintained and administered his mental health records and coordinated the various specialists on his Treatment Team. As Unit Director, she served as Head of Able Unit's Treatment Team, exercised and delegated final decision-making authority to the entire mental health services team on Able Unit, and trained and supervised them in the performance of their duties.  She was acting under color of law and within the scope of her employment with the IDHS.

7.    Defendant **William Miller** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as a Unit Security Supervisor ("STA II") at the Chester Facility at all times relevant to the allegations in this Complaint. As a STA II, he exercised and delegated final decision-making authority to the STAs on Able

Unit, and trained and supervised them in the performance of their duties. He was acting under color of law and within the scope of his employment with the IDHS.

8. Defendant **Bruce Williams** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as a Security Therapy Aide ("STA I") at the Chester Facility at all times relevant to the allegations in this Complaint. As a STA I, he was responsible for monitoring the safety and security of patients at the Chester Facility. He was acting under color of law and within the scope of his employment with the IDHS.

9. Defendant **Melissa Miller** is a citizen of the state of Illinois and sued in her individual capacity, as well as in her official capacity as a STA I at the Chester Facility at all times relevant to the allegations in this Complaint. As a STA I, she was responsible for monitoring the safety and security of patients at the Chester Facility. She was acting under color of law and within the scope of her employment with the IDHS.

10. Defendant **Anthony Anderson** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as a STA I at the Chester Facility at all times relevant to the allegations in this Complaint. As a STA I, he was responsible for monitoring the safety and security of patients at the Chester Facility. He was acting under color of law and within the scope of his employment with the IDHS.

11. Defendant **Michael Siegfried** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as a STA I at the Chester Facility at all times relevant to the allegations in this Complaint. As a STA I, he was responsible

for monitoring the safety and security of patients at the Chester Facility. He was acting under color of law and within the scope of his employment with the IDHS.

12.     Defendant **Jarrett Brooks** is a citizen of the state of Illinois and sued in his individual capacity, as well as in his official capacity as a Cook at the Chester Facility at all times relevant to the allegations in this Complaint. As a Cook, he prepared and served nutritional meals to the patients at the Chester Facility, consistent with their dietary needs. He was acting under color of law and within the scope of his employment with the IDHS.

13.     Each of the Defendants, their employees and agents, participated personally in the unlawful conduct challenged here and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Lawrence.  Each acted in concert with the other and their joint actions or omissions caused the violation of Lawrence's rights.

14.     On information and belief, all of the Defendants acted pursuant to an express or implied custom, policy, practice, or procedure within the Chester Facility that allows STAs and other staff members to violate written rules, abuse the rights of patients with impunity, and then to cover up these actions behind a "blue wall" of silence among the Chester Facility staff.

### Jurisdiction and Venue

15.     Lawrence's case arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as under 42 U.S.C. § 1981 and is expressly authorized by 42 U.S.C. § 1983 as a civil action to redress the deprivation of rights under color of state law. This Court accordingly has jurisdiction over it pursuant to 28 U.S.C. §§ 1331 and 1343 and pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

16.     Venue is proper in the District Court for the Southern District of Illinois under 28 U.S.C § 1391(b), because the events forming the basis of this Complaint occurred in this District.

## FACTUAL ALLEGATIONS

17.     On May 23, 2017, The Twelfth Judicial Circuit Court of Will County, Illinois ordered Lawrence to the Illinois Department of Human Services (the "Department") for an evaluation, following his acquittal to the charge of arson[2] upon receiving a verdict of Not Guilty by Reason of Insanity ("NGRI").

18.     The Department evaluated Lawrence, determined that he needed continuing inpatient mental health services, and transferred him to the Forensic Treatment Program at the Chester Facility, where it assigned him a clinical treatment team to implement a treatment plan and improve his mental condition so that he could be released back into the community.

---

[2] Lawrence also was acquitted of two additional charges:  (1) Possession of explosives; and (2) Criminal damage to property.

19.     Lawrence, a United States Army veteran of the Iraqi War, who has been diagnosed with Post Traumatic Stress Disorder ("PTSD"), was a *patient* involuntarily committed to the Chester Facility – *not* a prisoner convicted of a crime – and he enjoyed the full Constitutional rights and protections of any citizen of the United States of America.

### The Chester Facility Greeting

20.     By the time Lawrence arrived at the Chester Facility on September 26, 2017, he already had been under the custody and care of the IDHS for over four months and that state Agency, charged by law with treating his mental health issues, had not been forcing him to take any prescribed medications.  Nevertheless, on his first day there, a gang of four STAs, led by Michael McDonald (Charge Aid/STAII), positioned themselves in the doorway of his room and demanded to know: "Are we going to have any problems with you taking your medication while you're here?

### Walking the Able Unit Gauntlet

21.     Over the next several weeks, Lawrence settled into the daily routine of Able Unit in the Chester Facility (the clinical unit to which he had been assigned). But he began to notice a disturbing trend: at meal times, non-essential employees – those who did not provide healthcare or treatment to any of the patients on Able Unit – began to congregate in the hallway leading to the dining room in greater numbers and with greater frequency.

22.     As weeks turned into months, it came to pass that virtually every time the patients made their way to the dining facility for a meal, this gauntlet of outside staff

pressed closer and closer to the patients, staring them down, taunting them with increasingly rude and disrespectful comments, and steadily escalating the encounters toward some unknown (to the patients) yet inevitable confrontation.

23.     By December 8, 2017, Lawrence began skipping most of the dining room meals; choosing candy, snacks and prune juice in his own room over what had become a humiliating mealtime ritual.

24.     On about December 11, 2017, Lawrence requested that Heather Parker (a Chester Facility social worker) allow him to take his meals on the unit – a practice that the staff often allowed patients for a variety of reasons. Parker arranged for Lawrence to meet with Bree Barnett (nurse) and McDonald to discuss the issue. The meeting ended with both Barnett and McDonald refusing to allow him to take meals in the unit – warning him that he would not get any food unless he took his meals in the dining room.

25.     Lawrence still refused to go to the dining room, so later that day Parker arranged for him to meet with Supervising Nurse Tammi Craig. Craig directed someone on the staff to bring a meal to Lawrence while he stayed in the unit. Lawrence told Craig that he intended to file a grievance over the Able Unit Gauntlet with the Chester Facility's Office of Inspector General ("OIG").

26.     Lawrence met with Doug Hogan (Head of Security and the Chester Facility's OIG Representative) the next day, to complain about two things:  walking the Able Unit Gauntlet and the fact that some of the staff was abusing patients. Hogan told Lawrence that the he would not help him with Able Unit Gauntlet issue.

27.     For the next few days, Lawrence went to the dining room on only a couple more occasions. Craig told him that she would not authorize any more meal deliveries to him on the unit and he quickly lost 15 pounds in less than a week.

### The Chester Facility Begins Punishing Lawrence

28.     On about December 15, 2017, as the patients made their way to the dining room for breakfast, Chris Zang (housekeeping staff) joined the outsiders on the Able Unit Gauntlet. Standing close to the procession of patients, he stared each one down as they passed by. He approached Lawrence aggressively, pressing his face so close that their noses nearly touched and K. Koeneman (STA I) started laughing. Lawrence asked Zang why he was harassing patients and Koeneman promptly shoved him in the chest, barking at him to "get back inside!" Lawrence complied, yet she filed a false report on the incident, claiming that Lawrence had threatened a staff member.

29.     The next day, the Chester Facility punished Lawrence with a restriction of rights; prohibiting him from taking his meals in the dining room, restricting him to the unit and now *requiring* him to take his meals on the unit pursuant to the facility's meal monitoring protocol.

30.     On about December 18, 2017, Lawrence's clinical treatment team – including Shirley Forcum (social worker) and Dr. Nageswararao Vallabhaneni (psychiatrist) – met with him to discuss the Zang/Koeneman encounter. The team decided to allow Lawrence to take his meals on the unit.

31.     Defendant Williams opposed the decision and told others on the Chester Facility staff every chance he got. He aggressively confronted Lawrence anytime he tried to take his meals on the unit again and consistently spoke to him in a most degrading way. Defendant Melissa Miller also consistently voiced her disapproval and openly stated that now it was her personal mission to force Lawrence to return to the dining room for meals.

**The Chester Facility's Water-Tox Hoax**

32.     The Chester Facility staff immediately punished Lawrence by placing him on a "water-tox" protocol.  The staff often weaponized this protocol to punish patients – it allows them to shut down the toilet in the patient's room and drastically limit the patient's water intake. Water toxicity is a condition caused by an electrolyte imbalance from drinking massive amounts of water. It can only be confirmed with a blood test which, of course, was never done for Lawrence. This new protocol restricted him to, among other things, monitored use of the bathroom, monitored meals, and urinating only in cup.

33.     Over the next couple of months, members of both the nursing and security staffs falsified Lawrence's meal observation record to give the impression that he was eating less food than he actually did. This in turn provided them with the basis to inflict even more punitive measures on him.

**The Shake Downs**

34.     On approximately March 28, 2018, Lawrence and another patient, MV, spoke with a third patient, JM, about avoiding Defendant Melissa Miller, with whom JM had argued earlier in the day. Defendants Melissa Miller and Williams saw and heard the three patients discussing the incident and retaliated against them with a "shake down." Then, while the three patients were in the gym, the two Defendants unlawfully searched their rooms and removed personal items belonging to the patients.

35.     When the three patients requested grievance forms to complain, the Chester Facility responded by "shaking down" the entire unit.

36.     Before and during the "shake down" members of the staff, in particular Defendant Melissa Miller, threatened and intimidated the patients with racist taunts. Defendant Williams bragged: "We're on some white power shit."

37.     The next day the staff conducted yet another unit "shake down," accompanied again with threatening taunts and intimidation directed at the patients. At one point, Defendant Williams yelled out: "All this trouble because someone was mad about a crayon and decided to write complaints" [referring to MV].

38.     Lawrence, MV and JM again asked for complaint forms to file grievances about the retaliatory shakedowns and, in response, Defendant Williams denied Lawrence and MV barber privileges that week. The Chester Facility staff often used barber privileges to punish patients who complained about staff abuse and reward patients who were compliant with the abuse.

39.     On approximately April 3, 2018, the staff conducted the third unit "shake down." On this occasion, Defendant William Miller (Melissa's husband) told MV: "Since you guys want to file complaints, we're going to keep having shakedowns."

40.     On the same day, Lawrence filed another complaint, this one over the staff punishing him in retaliation for, among other things:  filing complaints against the staff; helping JM; and receiving permission from his treatment team to take meals in the unit (after complaining about the Able Unit Gauntlet).

## The Night Shift Makes Noise

41.     The night staff commonly harassed the patients while they tried to sleep. In mid-April 2018, Lawrence filed the first of three grievances about the night staff making loud noises intended to disrupt his sleep. In response, the night staff simply retaliated – they continued making the loud noise and, in fact, moved closer to his door to make sure they disturbed him even more.

42.     Then, on about April 23, 2018, Defendant Siegfried retaliated against Lawrence by moving him to a room that was close to a patient notorious for making loud noises all night.

43.     When Lawrence objected, Defendant Siegfried promptly filed a false report, alleging that Lawrence threatened him; which, in turn, gave the staff grounds to restrict his off-unit privileges.

## The Kitchen Staff Turns Up the Heat

44.     Around April 30, 2018, when Lawrence started taking his meals in the dining room again, members of the kitchen staff began harassing him. This lasted until his transfer to the Elgin Mental Health Center on August 18, 2018. Jarret Brooks (cook), in particular, stared and gestured at him in sexually suggestive ways. Brooks even claimed to others that he was contaminating Lawrence's food with feces and semen.

**The Security Staff Recruits Patient Capos to Harass and Assault Lawrence**

45.     By the end of July, the staff was encouraging patient AW to take personal items belonging to Lawrence and then directing him to threaten Lawrence and pick a fight with him.

46.     On about August 2, 2018 Anthony Anderson (STA I) provoked patient HP to verbally harass Lawrence for over an hour.  Then, later in the day, Anderson assaulted Lawrence by striking him repeatedly in the head and then holding Lawrence down so that HP could do the same.

**The Chester Facility's Complaint Protocol is Retaliation**

47.     In addition to speaking up on his own behalf, on many occasions during his stay at the Chester Facility, Lawrence saw staff members harass and abuse other patients: JL, RS and DP in particular. He reported these incidents internally to Chester Facility's administrative staff, to its OIG and also to an outside advocacy group known as Equip for Equality.

48.     In response, the Defendants targeted Lawrence with a steady, consistent stream of abuse, harassment and retaliation that lasted until his transfer to the Elgin Mental Health Center on August 18, 2018.

49.     Staff members called him a "snitch;" told him "nobody likes a snitch;" and threatened him with "Don't be next."

50.     In addition to the incidents above, the Defendants and other staff members also falsified incident reports about Lawrence; falsified his medical records; conducted sham investigations into his complaints; made it appear as if they were videotaping him with their cell phones; unlawfully walked in on him while he showered; physically assaulted him; and directed other patients to harass and assault him.

51.     Defendants IDPH, Harper, Scott, Smoot and Forcum directed and/or ratified each unlawful act in this retaliation campaign – all of which were carried out by Defendants William Miller, Williams, Melissa Miller, Anderson, Siegfried or Brooks, as well as other staff members at the Chester Facility – pursuant to express or implied customs, policies, practices or procedures.

### CLAIMS FOR RELIEF

### COUNT I:
### RETALIATION IN VIOLATION OF THE FIRST AMENDMENT

52.     Lawrence repeats and realleges Paragraphs 1–50 of this First Amended Complaint as if set forth fully herein.

53.     At all relevant times, pursuant to the First Amendment and 42 U.S.C. § 1983, Lawrence had a right to engage in protected speech without fear of retaliation by members of the Chester Facility.

54.     Defendants and their employees and agents violated Lawrence's right to engage in protected speech by retaliating against him with the unlawful shakedowns; unlawful seizures of his personal property, liberty and privileges; excessive use of force, physical assaults; and the continuing campaign of retaliation described above.

55.     Defendants engaged in these unlawful acts with the specific intent to deprive Lawrence of his constitutional right to engage in protected speech.

56.     The acts of the Defendants and their employees and agents were intentional in failing to protect and preserve Lawrence's rights and, at a minimum, Defendants were deliberately indifferent to the likely consequence that his protected speech would be unlawfully restricted.

57.     Any reasonable member of the Chester Facility staff knew or should have known of this right as it was clearly established at the time, based on past circumstances of similar constitutional and statutory violations of the law.

58.     As a direct and/or proximate result of Defendants' retaliatory actions, Lawrence suffered injury and damages.

### COUNT II:
### EXCESSIVE USE OF FORCE IN VIOLATION OF THE
### FOURTEENTH AMENDMENT

59.     Lawrence repeats and realleges Paragraphs 1–50 of this First Amended Complaint as if set forth fully herein.

60.     At all relevant times, pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, Lawrence had a right to bodily integrity and to be free from the excessive use of force by members of the Chester Facility staff.

61.     Defendants and their employees and agents violated Lawrence's right to bodily integrity and to be free from the excessive use of force by members of the Chester Facility staff by retaliating against him with the physical assaults described above.

62.     Defendants engaged in theses unlawful acts with the specific intent to deprive Lawrence of his constitutional right to bodily integrity and to be free from the excessive use of force by members of the Chester Facility staff.

63.     The acts of the Defendants and their employees and agents were intentional in failing to protect and preserve Lawrence's rights and, at a minimum, Defendants were deliberately indifferent to the likely consequence that he would be subjected to the excessive use of force by staff members at the Chester Facility.

64.     Any reasonable member of the Chester Facility staff knew or should have known of this right as it was clearly established at the time, based on past circumstances of similar constitutional and statutory violations of the law.

65.     As a direct and/or proximate result of Defendants' retaliatory actions, Lawrence suffered injury and damages.

**COUNT III:**
**RACIAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1981**

66.     Lawrence repeats and realleges Paragraphs 1–50 of this First Amended Complaint as if set forth fully herein.

67.     At all relevant times, pursuant to the Fourteenth Amendment, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 Lawrence, an African American, had a clearly established constitutional and statutory right to be free from racially motivated beatings, searches and seizures, shakedowns, and punitive measures, and to enjoy the equal protection of the laws.

68.     Defendants and their employees and agents violated these rights belonging to Lawrence by engaging in the beatings, searches and seizures, shakedowns, and punitive measures described above.

69.     Defendants engaged in these unlawful acts with the specific intent to deprive Lawrence of his constitutional right to be free from racially motivated beatings, searches and seizures, shakedowns, and punitive measures, and his right to enjoy the equal protection of the laws.

70.     The acts of the Defendants and their employees and agents were intentional in failing to protect and preserve Lawrence's rights and, at a minimum, they were deliberately indifferent to the likely consequence that members of the Chester Facility would subject him to racially motivated beatings, searches and seizures, shakedowns, and punitive measures and that he would be unlawfully prevented from enjoying the equal protection of the laws.

71.     Any reasonable member of the Chester Facility staff knew or should have known of these rights as they were clearly established at the time, based on past circumstances of similar constitutional and statutory violations of the law.

72.     As a direct and/or proximate result of Defendants' unlawful acts, Lawrence suffered injury and damages.

**COUNT IV:**
**UNREASONABLE SEIZURE OF PROPERTY , LIBERTY AND PRIVILEGES**
**IN VIOLATION OF THE FOURTH AMENDMENT**

73.     Lawrence repeats and realleges Paragraphs 1–50 of this First Amended Complaint as if set forth fully herein.

74.     At all relevant times, pursuant to the Fourth Amendment and 42 U.S.C. § 1983, Lawrence had a right to be free from the unreasonable seizure of his property, liberty and privileges caused by unlawful shakedowns, falsified incident reports, falsified medical records, unlawful strip searches, and unlawful restrictions on his privileges.

75.     Defendants and their employees and agents violated these rights by engaging in the unlawful shakedowns, falsified incident reports, falsified medical records, unlawful strip searches, and unlawful restrictions on his privileges described above.

76.     Defendants engaged in these unlawful acts with the specific intent to deprive Lawrence of his constitutional right to be secure in his property, liberty and privileges.

77.     The acts of the Defendants and their employees and agents were intentional in failing to protect and preserve Lawrence's rights and, at a minimum, Defendants were

deliberately indifferent to the likely consequence that his property, liberty and privileges would be unlawfully seized.

78.     Any reasonable member of the Chester Facility staff knew or should have known of these rights as they were clearly established at the time, based on past circumstances of similar constitutional and statutory violations of the law.

79.     As a direct and/or proximate result of Defendants' unlawful acts, Lawrence suffered injury and damages.

**REQUEST FOR RELIEF**

80.     Lawrence therefore requests that this Court enter judgment in his favor and against the Defendants Williams and Miller and award the following relief:

a.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by in an amount to be determined at trial, jointly and severally against all Defendants;

b.  Economic losses on all claims allowed by law, jointly and severally against all Defendants;

c.  Special damages in an amount to be determined at trial, jointly and severally against all Defendants;

d.  Punitive damages in an amount to be determined at trial, jointly and severally against all Defendants;

e.  Costs  and  reasonable  attorneys'  fees  pursuant  to  42  U.S.C.  §  1988, including expert witness fees, on all claims allowed by law, jointly and severally against all Defendants;

f.  Pre- and post-judgment interest at the lawful rate, jointly and severally against all Defendants; and

g.  Any other relief that this Court deems lawful, equitable and proper.

**DEMAND FOR JURY TRIAL**

81.  Lawrence hereby demands a trial by jury on all issues.

Dated:  July 22, 2019

Respectfully submitted,

/                                                                      s/ Thomas Scott

Stewart

Thomas Scott Stewart #44297 (MO)
7700 Bonhomme Ave., Suite 1800
Clayton, MO 63105
Tel: (314) 597-4779
Fax: (312) 627-1717
sstewart@tresslerllp.com

Attorney for Plaintiff

**EXHIBIT A**

**CIVIL RIGHTS COMPLAINT**
**WITH REQUEST FOR TRIAL BY JURY**


Now comes Denzil Lawrence ("Plaintiff"), in want of counsel, and file the instant civil complaint against the above-named Defendants, and each of them, and request trial by jury, and in support thereof state as follows.

**Preliminary**


1.      Plaintiff Denzil Lawrence is involuntarily committed to the Elgin Mental Health Center ("EMHC") that is devoid of adequate legal resources, has no training in the law, and invokes the lenient pleading standard pursuant to, inter alia, Haines v. Kerner, 404 U.S. 519 (1972). Also since Plaintiff has no counsel in this case, he respectfully requests that the court not construe against him any underdeveloped arguments or omissions that indicate meritlessness (See, e.g., United States v. Watson, 189 F. 3d 496, 500 (7th Cir. 1999) (for the proposition that inadequately developed or supported arguments are waived)). To the extent that Plaintiff may not have conformed to rules precisely, he requests the court's forbearance (See, e.g., United States v. 30.64 Acres of Land, 795 F. 2d 796, 805 (9th Cir. 1986) ("Quite obviously an incompetent person cannot be held to compliance with technical rules"). Also, individuals confined to mental institutions have the same fundamental right of access to the courts as individuals confined within penal institutions. See, e.g., Ward v. Kort 762 F. 2d 856,858 (10 Cir. 1985).


**Jurisdiction and Venue**


2.      This action arises under the Constitution and laws of the United States, including Section 1 of the Constitution of the United States, and is brought pursuant to 42 U.S.C. section 1983 and 42 U.S.C. section 1988. The jurisdiction of the Court is invoked pursuant to 28 U.S.C. sections 1331, 1343, and 2201.

3.      This case is instituted in the United States District Court for the Southern District of Illinois pursuant to 28 U.S.C. Section 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.


**Parties**

4.      At all times relevant hereto, the Plaintiff Denzil Lawrence, U.S. Army Veteran, and Operation Iraqi Freedom veteran, is a citizen of the United States of America, a resident of the State of Illinois and detained in the Elgin Mental Health Center. Plaintiff has no training in the law and Elgin Mental Health Center offers no sufficient legal resources. Plaintiff received substantial assistance from a "jailhouse lawyer" and would not otherwise be able to complete this complaint.

5.      At all times relevant hereto, Defendant Gregory Scott is a citizen of the United States and a resident of the State of Illinois. Defendant Gregory Scott is sued in his individual capacity as well as his official capacity as the Hospital Director of the Chester Mental Health Center during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Gregory Scott was Hospital Director and direct supervisor of Unit Directors Gary Hand, Jama Klausing, and Shirley Forcum and Heads of Security Doug Hogan, also the Office of Inspector General Representative and Barry Smoot during events herein complained of.

6.      At all times relevant hereto, Defendant Gary Hand is a citizen of the United States and a resident of the State of Illinois. Defendant Gary Hand is sued in his individual capacity as well as his official capacity as the Unit Director of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Gary Hand was Unit Director of Able (A) Unit and direct supervisor to all Charge Aides/STAII and Security Therapy Aides during events herein complained of.

7.      At all times relevant hereto, Defendant Jama Klausing is a citizen of the United States and a resident of the State of Illinois. Defendant Jama Klausing is sued in her individual capacity as well as her official capacity as the Unit Director of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Jama Klausing was Unit Director of Able (A) Unit and direct supervisor of all Charge Aides/STAII and Security Therapy Aides I during events herein complained of.

8.      At all times relevant hereto, Defendant Shirley Forcum is a citizen of the United States and a resident of the State of Illinois. Defendant Shirley Forcum is sued in her individual capacity as well as her official capacity as the Unit Director of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Shirley Forcum was Unit Director of Able (A) Unit and direct supervisor of all Charge Aides/STAII and Security Therapy Aides I during events herein complained of.

9.      At all times relevant hereto, Defendant Michael McDonald is a citizen of the United States and a resident of the State of Illinois. Defendant Michael McDonald is sued in his individual capacity as well as his official capacity as the Charge Aide/STAII of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Michael McDonald was Charge Aide/STAII of Able (A) Unit and direct supervisor of all Security Therapy Aides I during events herein complained of.

10.     At all times relevant hereto, Defendant William Miller is a citizen of the United States and a resident of the State of Illinois. Defendant William Miller is sued in his individual capacity as well as his official capacity as the Charge Aide/STAII of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting

under color of state law. William Miller was Charge Aide/STAII of Able (A) Unit and direct supervisor of all Security Therapy Aides I during events herein complained of.

11.    At all times relevant hereto, Defendant Shawn MacBeth is a citizen of the United States and a resident of the State of Illinois. Defendant Shawn MacBeth is sued in his individual capacity as well as his official capacity as the Charge Aide/STAII of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Shawn MacBeth was Charge Aide/STAII of Able (A) Unit during events herein complained of.

12.    At all times relevant hereto, Defendant Tammi Craig is a citizen of the United States and a resident of the State of Illinois. Defendant Tammi Craig is sued in her individual capacity as well as her official capacity as the Supervising Nurse of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Tammi Craig was Supervising Nurse and direct supervisor of Defendants Ashlee Cushman and Bree Barnett during events herein complained of.

13.    At all times relevant hereto, Defendant Laurie Irose is a citizen of the United States and a resident of the State of Illinois. Defendant Laurie Irose is sued in her individual capacity as well as her official capacity as the Human Rights Officer during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Laurie Irose was Human Rights Officer during events herein complained of.

14.    At all times relevant hereto, Defendant Doug Hogan is a citizen of the United States and a resident of the State of Illinois. Defendant Doug Hogan is sued in his individual capacity as well as his official capacity as the Office of Inspector General Representative during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Doug Hogan was Office of Inspector General Representative during events herein complained of.

15.    At all times relevant hereto, Defendant Doug Hogan is a citizen of the United States and a resident of the State of Illinois. Defendant Doug Hogan is sued in his individual capacity as well as his official capacity as the Head of Security during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Doug Hogan was Head of Security during events herein complained of.

16.    At all times relevant hereto, Defendant Barry Smoot is a citizen of the United States and a resident of the State of Illinois. Defendant Barry Smoot is sued in his individual capacity as well as his official capacity as the Head of Security during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Barry Smoot was Head of Security during events herein complained of.

17.    At all times relevant hereto, Defendant Ashlee Cushman is a citizen of the United States and a resident of the State of Illinois. Defendant Ashlee Cushman is sued in her individual capacity as well as her official capacity as the Unit Nurse during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Ashlee Cushman was Unit Nurse during events herein complained of.

18.     At all times relevant hereto, Defendant Bree Barnett is a citizen of the United States and a resident of the State of Illinois. Defendant Bree Barnett is sued in her individual capacity as well as her official capacity as the Unit Nurse during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Bree Barnett was Unit Nurse during events herein complained of.

19.     At all times relevant hereto, Defendant Melissa Miller is a citizen of the United States and a resident of the State of Illinois. Defendant Melissa Miller is sued in her individual capacity as well as her official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Melissa Miller was Security Therapy Aide I of Able (A) Unit during events herein complained of.

20.     At all times relevant hereto, Defendant Bruce Williams is a citizen of the United States and a resident of the State of Illinois. Defendant Bruce Williams is sued in his individual capacity as well as his official capacity as the Security Therapy Aide of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Bruce Williams was Security Therapy Aide I of Able (A) Unit during events herein complained of.

21.     At all times relevant hereto, Defendant Monica Griggs is a citizen of the United States and a resident of the State of Illinois. Defendant Monica Griggs is sued in her individual capacity as well as her official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Monica Griggs was Security Therapy Aide I of Able (A) Unit during events herein complained of.

22.     At all times relevant hereto, Defendant Anthony Anderson is a citizen of the United States and a resident of the State of Illinois. Defendant Anthony Anderson is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Anthony Anderson was Security Therapy Aide I of Able (A} Unit during events herein complained of.

23.     At all times relevant hereto, Defendant Michael Siegfried is a citizen of the United States and a resident of the State of Illinois. Defendant Michael Siegfried is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Michael Siegfried was Security Therapy Aide I of Able (A) Unit during events herein complained of.

24.     At all times relevant hereto, Defendant Gary Minter is a citizen of the United States and a resident of the State of Illinois. Defendant Gary Minter is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A ) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Gary Minter was Security Therapy Aide I of Able (A) Unit during events herein complained of.

25.     At all times relevant hereto, Defendant Lawrence Rock is a citizen of the United States and a resident of the State of Illinois. Defendant Lawrence Rock is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Lawrence Rock was Security Therapy Aide I of Able (A) Unit during events herein complained of.

26.     At all times relevant hereto, Defendant Curtis Cowell is a citizen of the United States and a resident of the State of Illinois. Defendant Curtis Cowell is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Curtis Cowell was Security Therapy Aide I of Able (A) Unit during events herein complained of.

27.     At all times relevant hereto, Defendant Jared Ebers is a citizen of the United States and a resident of the State of Illinois. Defendant Jared Ebers is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Jared Ebers was Security Therapy Aide I of Able (A) Unit during events herein complained of.

28.     At all times relevant hereto, Defendant Phillip Bonneville is a citizen of the United States and a resident of the State of Illinois. Defendant Phillip Bonneville is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Phillip Bonneville was Security Therapy Aide I of Able (A) Unit during events herein complained of.

29.     At all times relevant hereto, Defendant Karl Williams is a citizen of the United States and a resident of the State of Illinois. Defendant Karl Williams is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Karl Williams was Security Therapy Aide I of Able (A) Unit during events herein complained of.

30.     At all times relevant hereto, Defendant Amelia Gordon is a citizen of the United States and a resident of the State of Illinois. Defendant Amelia Gordon is sued in her individual capacity as well as her official capacity as the Security Therapy Aide I od Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Amelia Gordon was Security Therapy Aide I of Able (A) Unit during events herein complained of.

31.     At all times relevant hereto, Defendant K. Koeneman is a citizen of the United States and a resident of the State of Illinois. Defendant K. Koeneman is sued in her individual capacity as well as her official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester- Mental Health Center, and was

acting under color of state law. K. Koeneman was Security Therapy Aide I of Able (A) Unit during events herein complained of.

32.     At all times relevant hereto, Defendant Gregory Cady is a citizen of the United States and a resident of the State of Illinois. Defendant Gregory Cady is sued in his individual capacity as well as his official capacity as the Security Therapy Aide I of Able (A) Unit during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Gregory Cady was Security Therapy Aide I of Able (A) Unit during events herein complained of.

33.     At all times relevant hereto, Defendant Jarrett Brooks is a citizen of the United States and a resident of the State of Illinois. Defendant Jarrett Brooks is sued in his individual capacity as well as his official capacity as Cook during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Jarrett Brooks was Cook during events herein complained of.

34.     At all times relevant hereto, Defendant Chris Zang is a citizen of the United States and a resident of the State of Illinois. Defendant Chris Zang is sued in his individual capacity as well as his official capacity as Housekeeper during times pertinent hereto, employed by the Defendant Illinois Department of Human Services/the Chester Mental Health Center, and was acting under color of state law. Chris Zang was Housekeeper during events herein complained of.

35.     At all times relevant hereto, Defendant Cantina Rupert is a citizen of the United States and a resident of the State of Illinois. Defendant Cantina Rupert is sued in her individual capacity as well as her official capacity as the Office of Inspector General Representative during times pertinent hereto, employed by the Defendant Illinois Department of Human Services, and was acting under color of state law. Cantina Rupert was Office of Inspector General Representative during events herein complained of.

36.     At all times relevant hereto, Defendant Robin Weaver is a citizen of the United States and a resident of the State of Illinois. Defendant Robin Weaver is sued in her individual capacity as well as her official capacity as the Bureau Chief of Southern OIG Investigations during times pertinent hereto, employed by the Defendant Illinois Department of Human Services, and was acting under color of state law. Robin Weaver was Bureau Chief of Southern OIG Investigations and direct supervisor of Cantina Rupert during events herein complained of.

**Background**

37.     The plaintiff is involuntarily committed to the Illinois Department of Human Services ("DHS") and resides at the Elgin Mental Health Center ("EMHC"). The commitment is pursuant to findings of Not Guilty by Reason of Insanity ("NGRI").

38.     As an NGRI Plaintiff is not a prisoner according to the Prison Litigation Reform Act, nevertheless, he attempted to resolve his complaints in-house through the Chester Mental Hospital grievance process.

39.     Plaintiff has presented Defendants with a voluminous amount of grievances pertaining to the unconstitutional and complained of offenses and violations.

40.     Defendants have acknowledged and falsely rebutted Plaintiffs grievances in spite of factual evidence presented by the Plaintiff and witnesses.

41.     Defendants refused both in principle and in practice to remedy the complained of actions and violations.

42.     Plaintiff, Denzil A. Lawrence, has suffered actual injury from the unconstitutional system of harassment, psychological abuse, physical abuse and an environment of fear, harassment, abuse, and retaliation imposed on him by the staff at Chester Mental Health Center (CMHC).

43.     Due to plaintiff frequently objecting, both verbally and in written complaints, to the environment of abuse and harassment imposed upon him and other patients by the staff at Chester Metal Health Center, he was targeted for retaliation and harassment by the CMHC staff.

44.     Upon arrival at CMHC plaintiff went through the intake process and was taken to his room. While getting settled in plaintiff was sitting on his bed when a group of four STAs lead by STAII Michael McDonald appeared in his doorway and stood blocking his doorway in an intimidating manner. At this time STAII McDonald asked plaintiff to confirm his name and then asked, "Are we going to have any problems with you taking your medication while you're here?", to which plaintiff responded, "I haven't been prescribed any at this time but if I am I'll be taking them." STAII McDonald then said, "Alright", and then he and the rest of the STAs left. This had the effect of intimidating plaintiff.

45.     On or around 12/16/2017, plaintiff was written up and restricted to the unit due to a confrontation with a member of the housekeeping staff on December 15, 2017 that had been weeks, if not months, in the making. For some time, plaintiff was noticing that that staff from the Able (A) unit was allowing employees not associated with Able (A) unit to be present while patients were on the way to meals in the dining room. This was odd as it was unusual from what plaintiff was used to seeing and was happening in increasing frequency. Moreover, these other employees were not simply present but were also making rude and disrespectful comments about the Able (A) unit patients in a taunting and confrontational manner. In the days leading up to the incident for which plaintiff was written up, this interaction with other employees from outside of the unit grew closer and closer to confrontation as they would get closer and closer to the patients and stare them down in a threatening manner as they entered the dining room. This made the plaintiff extremely uncomfortable to the point that he feared going to the dining room in the event and escalated and physical confrontation occurred. As a result, plaintiff began skipping most (if not all) meals from 12/8/2017 to survived only on candy in his commissary box and snacks and prune juice given out by staff every evening on the unit. As a result of this the plaintiff lost fifteen pounds (15 lbs.) during the time he did not go to the dining room as the staff failed to enact it's meal monitoring and refused to bring him meals.

46.     The meal monitoring protocol means that the plaintiff would have received his meals on the unit with other patients who were getting their meals on the unit. Patients frequently eat on the unit for various reasons.

47.     On or around 12/11/2017 plaintiff spoke with social worker Heather Parker about the issue and asked about eating on the unit. She had plaintiff attend a meeting with Nurse Bree Barnett and STAII

Michael McDonald to discuss the issue. The meeting ended with both Nurse Bree Barnett and STAII Michael McDonald telling plaintiff that he would not get any food unless he went to the dining room. At this point the plaintiff had not been given a meal in three (3) days.

48.      Later that same day, after plaintiff refused to go to the dining room again, SWII Heather Parker had plaintiff meet with supervising nurse Tammi Craig who arranged for plaintiff to be brought a tray. Plaintiff stated that he would call OIG on this issue.

49.      The following day, on or around 12/12/2017, the plaintiff met with head of security and OIG Rep Doug Hogan. Mr. Hogan took plaintiffs statement about the abuses of other patients and told plaintiff the he would not help with the meal issues. Over the next three (3) days plaintiff went to the dining room on only a couple more occasions. Tammi Craig told him that she would not authorize any more trays for him on the unit. Plaintiff lost 15 lbs. during this time period.

50.      On or around 12/15/2017, while walking to the dining room for breakfast, plaintiff observed Chris Zang, an employee from the housekeeping staff, come walking in the door. As he approached the patients he stopped and stood directly beside STA K. Koeneman and began staring at each passing patient in a confrontational manner.

51.      Chris Zang began staring at plaintiff almost nose to nose in a confrontational manner. Chris Zang continued his intimidating behavior as STA K. Koeneman began to laugh about it. Plaintiff asked Chris Zang why he was harassing patients. STA Koeneman shoved plaintiff in the chest causing him to stumble and told him to get back inside. After regaining his balance plaintiff then turned and walked back into the dining room and got back in line. A false report was filed on this incident on or around 12/16/2017.

52.      On or around 12/16/2017 plaintiff was notified in writing of a restriction of rights stating that he was not allowed to return to the dining room or leave the unit and was given his meals on the unit.

53.      On or around 12/18/2017 plaintiff met with the unit treatment team, to include his social worker SWIII Shirley Forcum and psychiatrist Nageswararao Vallabhaneni, to discuss the events that had taken place. At this point it was determined that plaintiff would be eating on the unit going forward.

54.      STA Bruce Williams very consistently vocally voiced his disapproval of this decision to the rest of the staff and proceeded to speak to the plaintiff in a degrading tone and behaved in a confrontational manner anytime the plaintiff was given his meal on the unit. STA Melissa Miller was also vocal in her disapproval and openly stated that it was now her personal mission to make sure that she caused plaintiff to lose the right to eat on the unit and force him to return to the dining room.

55.      On or around 12/18/2017 patient was approached by Nurse Ashlee Cushman of the nursing staff and told that he would be under observation for being "water-tox" and given an urinal to urinate into whenever he had to use the restroom and that he was also placed on "meal observation."

56.      Water toxicity causes an electrolyte imbalance due to drinking massive amounts of water. However, CMHC staff frequently use this label to justify turning off toilets in the cells and drastically limiting water intake. Electrolyte imbalance must be confirmed by a blood test which was not done for Plaintiff.

57.     Over the next couple months plaintiff's meal observation record was falsified by the nursing staff and security staff to give the impression that he was consuming less food than he actually was in order to force even further retaliatory actions.

58.     On several occasions plaintiff was witness to severe harassment and/or abuse of other patients by staff at CMHC and made these problems known to the administrative staff and the outside agencies Equip for Equality and OIG through written complaints and witness statements. For his role in assisting other patients that were being targeted by the abusive staff the plaintiff was himself made a target for harassment and abuse. Some of these events are as follows:

59.     On or around 12/17/2017 plaintiff observed patient Jimmy Lee being verbally harassed and abused another patient (Keith Carter) under the direction of STA Amelia Gordon and Emily Colvin.  This harassment caused patient Jimmy Lee to have a mental breakdown leading to his being placed in restraints.

60.     On or around 12/18/2017, while eating breakfast with him, plaintiff observed that patient Jimmy Lee had suffered what appeared to be a severe physical assault. When questioned by the plaintiff patient Jimmy Lee revealed that he had been repeatedly physically attacked by STA Karl Williams while he was in restraints the previous night.

61.     On or around 1/9/2018 plaintiff observed patient Jimmy Lee sitting in a chair in the dayroom being harassed by STA Melissa Miller, STA Bruce Williams and STA Phillip Bonneville. The harassment resulted in STA Philip Bonneville kicking patient Jimmy Lee on the leg and Patient Jimmy Lee then being verbally abused by STA Melissa Miller and STA Bruce Williams.

62.     On or around 1/12/2018 plaintiff observed patient Jimmy Lee being led off of the unit and into the hallway outside of the unit where there are no cameras by then Unit Director Gary Hand and other members of the staff. Upon his return to the unit a few minutes later patient Jimmy Lee was loudly complaining that he was given a shot that was not part of his regular medication regiment. Plaintiff observed that patient Jimmy Lee began behaving erratically and was going in and out of consciousness for the rest of the day after being taken into the hallway.

63.     On or around 2/2/2018 plaintiff observed patient Jimmy Lee being verbally harassed and abused by another patient (Keith Carter) under the direction of STA Bruce Williams. Plaintiff reported this incident to the agency Equip for Equality and asked for their intervention into patient Jimmy Lee's case.

64.     Plaintiff reported these and other incidents of abuse, harassment, and neglect to the agency Equip for Equality and asked for their intervention into patients Jimmy Lee's and Ronnie Smith's cases out of fear for their safety and well-being.

65.     On or around 12/31/2017 plaintiff observed patient Ronnie Smith being forced into his room by STA Justin Couch and STA Eric Tucker followed by what sounded like a hard punch to patient Ronnie Tucker. The following day, 1/1/18, plaintiff observed patient Ronnie Smith with a swollen face from what looked like a physical beating.

66.     On or around 4/9/2018 plaintiff observed patient David Poole being verbally and physically abused by STAII Michael McDonald after he called out from inside the shower to the nurse for help for a cut on his leg that was bleeding profusely. After being verbally and physically abused patient David

Poole was unjustly restrained for an inappropriate amount of time and denied food and use of the restroom to relieve himself.

67.     After plaintiff reported these incidents of abuse to CMHC staff and other outside agencies the CMHC staff began making harassing comments calling the plaintiff a "snitch" and making threats of retaliation such as "Nobody likes a snitch," and "Don't be next."

68.     On or around 3/10/2018 STA Monica Griggs entered plaintiff's unit during med pass time and told plaintiff a racist joke meant to demean and embarrass plaintiff due to his race and cultural background.

69.     On or around 3/28/2018 plaintiff and another patient, Michael Villagran, spoke with another patient, Jesse Morrise, in the day room to offer him advice about staying out of trouble with an especially difficult STA, Melissa Miller, with whom he had an argument earlier in the morning. As plaintiff and other patients spoke, STA Melissa Miller and STA Bruce Williams listened in on their conversation and apparently decided to retaliate against the patients for speaking about the incident.

70.     As the three patients went to the gym the two STAs searched their rooms without the patients being present and removed personal items from their rooms.

71.     When the patients requested grievance forms to address the obvious retaliation against them the staff responded by conducting a "shake down"/room search of the entire unit.

72.     Before and during the "shake down" members of the staff, including STA Bruce Williams, who made the remark, "We're on some white power shit," and STAII William Miller made threatening and racist remarks to the patients to intimidate them.

73.     On or around 3/29/2018 the staff again conducted a unit "shake down and again made threatening remarks to intimidate the patients. STA Bruce Williams was heard making the statement, "All this trouble because someone was mad about a crayon and decided to write complaints."

74.     Plaintiff and other patients again asked for complaint forms to file grievances about the retaliatory shakedowns and, in response, STA Bruce Williams removed patients' names from the barber list and denied them access to the barber for at least the next two weeks.

75.     On or around 4/3/2018 the staff conducted the third unit "shake down" in less than a week. During the "shakedown" STAII William Miller was heard by plaintiff making the statement, "Since you guys want to file complaints, we're going to keep having shakedowns," when asked by patient Michael Villagran why we were having so many shakedowns. Patient Michael Villagran then responded by saying, "Well if you stop treating people so bad, we wouldn't have to write complaints," to which STAII William Miller replied, "Oh, you haven't been treated badly yet!" These statements were made so that all patients nearby could hear them.

76.     On or around 4/3/2018 plaintiff filed complaint about being denied access to the barber over the previous months in retaliation for his filing complaints and requesting to have his meals on the unit. The unit barber list was often used by staff as a way of punishing patients who had filed complaints against them and reward the patients that were compliant with the abuse, harassment and intimidation.

77.     This form of retaliation against Plaintiff was carried out over several months by STA Monica Griggs, STA Jared Ebers, STA Melissa Miller, STA Phillip Bonneville, STA Michael Siegfried, STAII Michael McDonald, STAII William Miller, Nurse Bree Barnett and Nurse Ashlee Cushman.

78.     On or around 4/12/2018 plaintiff filed the first of three complaints regarding the night staff making noise and causing him to go without sleep on a nightly basis. This complaint was met with retaliation by the night staff who continued to make noise and even moved closer to the plaintiff's door to make sure the noise affected him.

79.     On or around 4/23/2018 STA Michael Siegfried moved plaintiff from his room to another room so that he could be close to a patient that made noise all night in retaliation for plaintiff filing complaints of night shift staff making noise all night and keeping him awake.

80.     When plaintiff objected to this arrangement STA Michael Siegfried filed a false report alleging that he was threatened by the plaintiff thereby causing the plaintiff to lose his off-unit privileges and have a negative mark on his record.

81.     On or around 4/30/2018, upon resuming eating meals in the dining room instead of on the unit where patient had been receiving meals, patient began experiencing harassing and sexually inappropriate behavior by kitchen staff.

82.     On or around 4/30/2018 during his lunch meal, patient experienced kitchen staff pointing and laughing at him as he walked by in line to pick up his food tray, causing plaintiff to become upset and emotionally distressed.

83.     Over the course of the next few weeks plaintiff experienced similar harassing behavior from kitchen staff, including uncomfortable looks and stares from Cook Jarrett Brooks during the first few weeks of June.

84.     On or around 5/30/2018 plaintiff was standing in the patient shower in a state of undress when STA Melissa Miller came to the door and opened it without knocking or letting plaintiff know that she was going to open the door in an attempt to embarrass plaintiff. She then turned to another STA on the unit and told them that it was the plaintiff in the shower before closing the shower door and walking away. This action was done to embarrass, degrade and humiliate Plaintiff.

85.     On or around 6/22/2018 Cook Jarrett Brooks began pointing and smiling at plaintiff and nodding his head up and down as to if to indicate that he was interested in the plaintiff sexually.

86.     Plaintiff became upset at these advances and decided to speak up against Cook Jarrett Brooks' advances to which he, Jarrett Brooks, responded by laughing and blowing kisses to the plaintiff.

87.     Plaintiff left the dining room visibly upset and shaken.

88.     On or around 6/25/2018, Cook Jarrett Brooks increased his harassment of plaintiff during breakfast meal by exhibiting the behavior of licking his lips and blowing kisses at the plaintiff.

89.     This behavior was witnessed by patient/pre-trial detainee Bryon K. Champ and caught on facility security camera.

90.     In addition to the ongoing violations committed against plaintiff by the staff at CMHC, another patient was also recruited by the staff to aid in the violations by way of physical and verbal intimidation and financial exploitation.

91.     On or around 7/26/2018 plaintiff witnessed patient Arius Williams coming out of a unit shower stall wearing plaintiff's underwear. Plaintiff filed a complaint with the security staff and asked to speak with the Unit Director about the issue as it was apparent that, after plaintiff questioned patient Arius Williams, the underwear was given to him by the security staff.

92.     In retaliation for plaintiff complaining about his personal property/clothes being given to another patient without his knowledge and/or permission and against facility policy, plaintiff was then threatened by the patient to whom his personal property was given at the encouragement and support of the staff who gave him direction on how to incite plaintiff into fighting.

93.     The following morning, on or around 7/27/2018, before patients left the unit to go to breakfast in the dining room, plaintiff observed the STAII on duty allowing patient Arius Williams to go through a box of food that the plaintiff had received from his family the previous day and allowing patient Arius Williams to identify what food items he wanted to have from the box of food that was not his.

94.     During commissary time later on the same day, on or around 7/27/2018, plaintiff observed STA Curtis Cowell enter the room where the plaintiff's box of food was being kept and retrieve the items that patient Arius Williams had selected earlier in the day, delivering them to his room so that he could consume them out of sight.

95.     On or around 8/2/2018 STA Anthony Anderson provoked patient Hemant Patel to verbally harass plaintiff for over an hour.

96.     On or around 8/2/2018, Plaintiff was physically assaulted by STA Anthony Anderson who struck plaintiff in the head at least five (5) times then held plaintiff in place while he was struck by patient Hemant Patel.

97.     On or around 8/3/2019, Plaintiff was placed on medical unit restriction for observation for a concussion due to the physical assault by STA Anthony Anderson.

98.     The harassment and physical assault was witnessed by patient Deambrece Hobbs.

99.     On or around 8/9/2018, patient was verbally harassed and taunted by STA Gregory Cady about his complaint to the Office of Inspector General about being assaulted by STA Anthony Anderson.

100.     On or around 8/13/2018, plaintiff observed a piece of his personal clothing that had earlier been inventoried to be placed in storage in the facility basement laying on the pool table in the dayroom of the unit. Plaintiff checked the drawer in his room to verify that this was in fact the case and then returned to the dayroom to hold up the clothing item to the camera for visual record verification.

101.     Plaintiff then returned the clothing item to his room and placed a call to OIG to make an official complaint.

102.     On or around 8/14/2018, while waiting from a response from OIG, the plaintiff's room was burglarized by a member of the security staff who entered his room and removed the clothing item that he had retrieved from the pool table the day before. The clothing item was never recovered.

103.     On the following dates the following staff members at Chester Mental Health Center violated the plaintiff's privacy and HIPM rights by using their personal cell phones against facility policy, state policy, and HIPM laws. Additionally, because of plaintiff's mental health history he suffered anxiety and distress due to the staffs illegal and improper use of their personal cell phones:

104.     On or around 3/29/2018, plaintiff was called to the medical office to be weighed by STA Karen Romines and had to leave the unit to go to the medical office. As plaintiff left the unit and entered the stem {administrative area} he observed STA2 Michael McDonald, who was sitting at his desk at the entrance of the plaintiffs unit, pointing his personal cell phone toward patient as he walked by, leading plaintiff to believe that he was being filmed by STA2 Michael McDonald, causing plaintiff anxiety and distress.

105.     On or around 4/11/2018, while standing in line in the hallway of module A-3, plaintiff observed STA Lawrence Rock (a.k.a., Shane) using his personal cell phone in plain view of patients while sitting watch over patient Jimmy Lee in front of Rm. 326. STA Lawrence Rock was pointing his personal cell phone in the direction of the plaintiff leading plaintiff to believe that he was being filmed by STA Lawrence Rock, causing plaintiff anxiety and distress.

106.     On or around 6/3/2018, while standing outside on the North Yard conversing with a group of other patients behind the utility building, plaintiff observed STA2 Shawn MacBeth emerge from the side of the building, raise his personal cell phone toward the group of patients as if taking a picture or recording, then lower it and appear to send a message. This action lead plaintiff to believe that he was being filmed by STA2 Shawn MacBeth, causing plaintiff anxiety and distress.

107.     On or around 6/15/2018, while playing basketball at the facility gym, plaintiff observed STA Gary Minter (a.k.a., Wayne) pointing his personal cell phone toward the basketball court, where plaintiff was playing, as if he were recording the group of patients playing basketball. This action lead plaintiff to believe that he was being filmed by STA Gary Minter, causing plaintiff anxiety and distress.

108.     This action was reported to Human Rights Officer Laurie Irose, who, although present and observed these actions, took no action to correct this behavior.

109.     This incident was witnessed by patients Michael Villagran and Bryon K. Champ and Activity Therapist Adam Emling.

110.     On or around 8/9/2018, plaintiff again observed STA Gary Minter using his personal cell phone, pointing it toward plaintiff and other patients while they were in the gym playing basketball. This incident was not report but was witnessed by several other patients. This action lead plaintiff to believe that he was being filmed by STA Gary Minter, causing plaintiff anxiety and distress.

111.     On or around 8/16/2018 plaintiff again observed STA Gary Minter using his personal cell phone, pointing it toward plaintiff and other patients while they were in the gym playing basketball. The plaintiff approached STA Gary Minter shortly after making this observation and requested that he put his personal cell phone away and stop filming. STA Gary Minter responded by placing his personal cell phone in his pocket without saying a word. This action lead plaintiff to believe that he was being filmed by STA Gary Minter, causing plaintiff anxiety and distress.

34

112.    In addition to the facility, state and HIPAA violations committed by these staff members, they knew, should have known and as staff responsible for plaintiffs treatment had a duty to know that these illegal uses of their personal cell phones would have triggered a response from the plaintiff in light of his mental health history of having anxiety about smart phones, causing him anxiety and distress.

113.    As CMHC Hospital Administrator Gregory Scott knew, should have known and had a duty to know of the culture of intimidation, harassment and retaliation at CMHC including but not limited to physical violence toward patients, but chose to "turn a blind eye" to the situation, allowing it to persist.

114.    As Able (A} unit director Gary Hand knew, should have known and had a duty to know of the culture of intimidation, harassment and retaliation at CMHC, including but not limited to physical violence toward patients, but chose to "turn a blind eye" to the situation, allowing it to persist.

115.    As Able (A) unit director Jama Klausing knew, should have known and had a duty to know of the culture of intimidation, harassment and retaliation at CMHC, including but not limited to physical violence toward patients, but chose to "turn a blind eye" to the situation, allowing it to persist.

116.    As Able (A) unit director Shirley Forcum knew, should have known and had a duty to know of the culture of intimidation, harassment and retaliation at CMHC, including but not limited to physical violence toward patients, but chose to "turn a blind eye" to the situation, allowing it to persist.

117.    As an investigator for OIG, Doug Hogan had a duty to thoroughly investigate any and all allegations of abuse and neglect toward plaintiff. Hogan knew, should have known and had a duty to know that plaintiff was being severely abused and neglected. He chose to "turn a blind eye" to the situation allowing it to persist.

118.    As CMHC's Head of Security, Barry Smoot knew, should have known and had a duty to know of the culture of intimidation, harassment and retaliation at CMHC, including but not limited to physical abuse toward patients, but chose to "turn a blind eye" to the situation, allowing it to persist.

119.    As an investigator for OIG, Cantina Rupert had a duty to thoroughly investigate any and all allegations of abuse and neglect toward plaintiff. Rupert knew, should have known and had a duty to know that plaintiff was being severely abused and neglected. By failing to conduct a thorough and factual investigation she chose to "turn a blind eye" to the situation allowing it to persist.

120.    As a Bureau Chief of Southern OIG Investigations, Robin Weaver had a duty to thoroughly investigate any and all allegations of abuse and neglect toward plaintiff. Weaver knew, should have known and had a duty to know that plaintiff was being severely abused and neglected. By failing to conduct a thorough and factual investigation she chose to "turn a blind eye" to the situation allowing it to persist.

121.    The actions or omissions to act at CMHC staff in supervisory roles, including but not limited to, Scott Hand, Klausing, Forcum and Smoot, has facilitated the culture of intimidation, harassment and retaliation at CMHC complained of herein.

122.    Chester Mental Health Center received federal funding.

**Legal Claims**

**Count 1: Retaliation for Engaging In Protected Conduct 42 U.S.C. Section 1983**

123.    Plaintiff incorporates paragraphs 1 through 122 as if stated fully.

124.    Plaintiff was retaliated against severely for engaging in constitutionally protected conduct in the form of free speech.

125.    Plaintiff was compelled by his conscience to speak up and advocate for himself and other patients and pointed out wrongdoing of staff, among other things.

126.    Defendants engaged in the aforementioned unconstitutional conduct knowingly, willfully, maliciously and under color of state law with the intention of retaliating against Plaintiff for exercising his constitutional right to freedom of speech.  Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

127.    Defendants engaged in a "campaign of harassment" against Plaintiff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

**Count 2: Retaliation for Engaging In Protected Conduct 42 U.S.C Section 1983**

128.    Plaintiff incorporates paragraphs 1 through 122 as if stated fully.

129.    Plaintiff was retaliated against severely for engaging in constitutionally protected conduct in the form of seeking redress from the government. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

130.    Plaintiff was compelled by his conscience to file written grievances trying to get CMHC officials to cease their unconstitutional, illegal and harmful behavior both against him and other patients. Plaintiff sought redress from both CMHC officials and OIG officials. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

131.    Not only were Plaintiffs grievances ignored, Defendants retaliated against him for it. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

132.    Defendants engaged in the aforementioned unconstitutional conduct knowingly, willfully, maliciously and under color of state law with the intention of retaliating against Plaintiff for exercising

his constitutional right to seek redress from the government. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

133.    Defendants engaged in a "campaign of harassment" against Plaintiff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

### Count 3: Violation of 14th Amendment Due Process and Equal Protection 42 U.S.C. Section 1983

134.    Plaintiff incorporates paragraphs 1 through 122 as if stated fully.

135.    Plaintiff was denied adequate and humane care and treatment while at CMHC. Such denial was without appropriate due process. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

136.    Defendants denied Plaintiff due process rights when they subjected him to a culture of intimidation, harassment, retaliation and oppressive violence. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

137.    Defendants denied Plaintiff his due process rights when they refused to adequately feed him causing him to lose significant amounts of weight. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

138.    Defendants denied Plaintiff his due process rights when STA Anthony Anderson used excess force and punched Plaintiff 5 times warranting CMHC medical staff to place Plaintiff on concussion protocol. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

139.    Defendants denied Plaintiff his due process rights when they subjected him to a lengthy and intense "campaign of harassment." Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

140.    Defendants denied Plaintiff his equal protection rights when they made racist jokes. They denied Plaintiff said rights when they used racism to justify harassing unit and room searches. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

141.    Defendants engaged in the aforementioned unconstitutional conduct knowingly, willfully, maliciously and under color or state law. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

142.     Defendants acted with deliberate indifference when they allowed and/or facilitated other patients to engage in physical violence against Plaintiff. Defendants allowed and/or facilitated other patients to act as proxies for engaging in physical violence and other forms of harm, harassment and intimidation against Plaintiff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

143.     Defendants knew, should have known and had a duty to know that there was a substantial risk of harm to Plaintiff and they failed to respond reasonably to protect Plaintiff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

144.     Defendants engaged in the aforementioned unconstitutional conduct knowingly, willfully, maliciously and under color of state law with the intention of depriving Plaintiff of his due process rights. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

145.     Defendants denied Plaintiff his due process rights when they engaged in race-based discrimination in delivery of adequate and humane care and services. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

146.     Defendants denied Plaintiff his due process rights when they failed to conduct a thorough and factual investigation that would have turned up evidence contradictory to staff statements. The Office of Inspector General serves to protect staff and conceal wrongdoing. The Office of Inspector General refuses to incriminate IDHS. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.


**Count 4: Conspiracy to Deny Plaintiff Due Process and Equal Protection 42 U.S.C. Section 1983**


147.     Chester Mental Health Center has entered into a conspiracy by purposely providing OIG with false, inaccurate, and misleading information pertaining to the allegations against them in order falsely influence the outcome of the OIG investigation(s.) Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

148.     Chester Mental Health Center has entered into a conspiracy to deny plaintiff due process and equal protection under 42 U.S.C. Section 1983 by concealing evidence in order to protect itself and its staff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

149.     The Office of Inspector General has entered into a conspiracy to deny plaintiff due process and equal protection under 42 U.S.C. Section 1983 by purposely refusing to conduct a thorough and factually accurate investigation in order to protect CMHC and its staff. Defendants all owe a duty of care to

Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

150.     The Office of Inspector General has entered into a conspiracy to deny plaintiff due process and equal protection under 42 U.S.C. Section 1983 by concealing evidence in order to protect CMHC and its staff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

151.     The Office of Inspector General has entered into a conspiracy to deny plaintiff due process and equal protection under 42 U.S.C. Section 1983 by purposely refusing to interview witnesses to plaintiff claims who would have provided evidence contrary to the OIG findings in order to protect CMHC and its staff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

152.     The Office of Inspector General has entered into a conspiracy to deny plaintiff due process and equal protection under 42 U.S.C. Section 1983 by purposely producing a finding in the investigation of plaintiff complaints that are factually inaccurate and misleading in order to protect CMHC and its staff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

153.     The Office of Inspector General has entered into a conspiracy to deny plaintiff due process and equal protection under 42 U.S.C. Section 1983 by purposely and falsely mis categorizing the findings of its investigation(s) as "unfounded" in order to protect CMHC and its staff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

154.     The Office of Inspector General serves to protect CMHC and IDHS staff and conceal wrongdoing.

Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

155.     The Office of Inspector General refuses to incriminate CMHC and IDHS despite evidence to their culpability. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

**Count 5: Violation of Health Insurers Portability and Accountability Act (HIPAA)**

156.     Plaintiff incorporates paragraphs 1 through 122 as if stated fully.

157.     Plaintiff is a patient in a hospital, not a prisoner in a correctional facility. Plaintiffs rights to privacy are the same as patient hospitalized for medical reasons. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

158.     Plaintiff had his privacy rights constitutionally violated by Defendants who used cell phones to record Plaintiff. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

159.     Plaintiff did not give prior written authorization for Defendants to film and/or photograph him. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

160.     Defendants engaged in the aforementioned unconstitutional conduct knowingly, willfully, maliciously and under color of state law with the intention of disseminating Plaintiffs private, protected health information without his prior written consent. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

161.     All records generated by CMHC as a hospital are subject to HIPAA. 162.Falsfiying hospital records is a violation of HIPAA.

163.     Defendants knowingly, willfully and maliciously falsified Plaintiff's records as part of their campaign of harassment against him. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

164.     As hospital employees, Defendants are trained in proper HIPAA procedures. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

165.     Defendants knew, should have known and had a duty to know that filming and/or photographing Plaintiff and falsifying Plaintiff's records violated HIPAA. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

166.     These actors caused Plaintiff emotional and psychological distress and prolonged an unnecessary detention in the highly restrictive CMHC. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.


**Count 6: Violation of Civil Rights Act: Race-based Discrimination in the Delivery of Mental Health Services**


167.     Plaintiff incorporates paragraphs 1 through 122 as if stated fully.

168.     Plaintiff is African American; the majority of CMHC patients are African-American.

169.     Defendants refused to provide Plaintiff with adequate and humane care and services due to his race. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

170.     Defendants, most, if not all of them, are Caucasian, made clear their race-based motivations on a number of occasions including but not limited to such overt acts of racism like racist jokes and "White Power" statements made to justify repeated harassing and unnecessary room searches. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

171.     The racism directed toward Plaintiff deprived him of adequate and humane care and services for his mental disorder as well as emotional distress enhanced by the fact that such racist people had total control over his life. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

172.     Defendants knew, should have known and had a duty to know that their racist behavior would cause harm to Plaintiff. Defendants nonetheless engaged in this conduct knowingly, willfully and maliciously with the intention of discriminating against Plaintiff due to his race. Defendants all owe a duty of care to Plaintiff as employees of an accredited hospital intended for the care, treatment and rehabilitation of persons with mental disorders.

**Verification**

Under the pains and penalties of perjury Plaintiff swears that the aforementioned statements are true and correct to the best of his knowledge.

Respectfully Submitted,

_____                              _____

Denzil A. Lawrence                                                              Date

**Plea for Leniency**

Plaintiff has no formal legal training. Plaintiff invokes leniency accorded to prose petitioners pursuant to Haines v. Kerner 404 U.S. 519. Plaintiff has no access to legal resources and respectfully requests that the court not prematurely dismiss any counts until an attorney can correct any omissions and errors.

Respectfully Submitted,

_____

Denzil A. Lawrence

**PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment for the plaintiff and against each of the Defendants and grant:

A.      Compensatory and consequential damages, including damages for deprivation of Plaintiffs constitutional and statutory rights, and other pain and suffering on all claims allowed by law in an amount to be determined at trial in excess of the jurisdictional limit;

B.      Damages for present and future pain and suffering;

C.      Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial in excess of the jurisdictional limit;

D.      Any attorneys' fees and costs associated with this action under 42 U.S.C. 1988, including expert witness fees, on all claims allowed by law;

E.      Conjunctive relief to amend erroneous entries to Plaintiff medical records.

F.      Pre- and post-judgment interest at the lawful rate; and,

G.      Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.